**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|                              |     |            |
| ---------------------------- | --- | ---------- |
| **JEANNE BAUGH,**            | )   |            |
|                              | )   |            |
|    **Plaintiff,** | )   |            |
|                              | )   |            |
|      vs. | )   | **CV16-430** |
|                              | )   |            |
| **ROBERT MORRIS UNIVERSITY,** | )   |            |
|                              | )   |            |
|    **Defendant.** | )   |            |
|                              | )   |            |

## OPINION

CONTI, Chief District Judge

Pending before the court is the motion for summary judgment filed by defendant Robert

Morris University ("RMU") with respect to the first amended complaint ("amended complaint")

filed by the plaintiff Jeanne Baugh ("Dr. Baugh"). (ECF No. 35). In the amended complaint, Dr.

Baugh, a professor at RMU, alleges claims against RMU[1] of 1) sex discrimination in violation of

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"),

2) sex discrimination in violation of Title IX of the Education Amendments of 1981, 20 U.S.C.

§ 1681, *et seq.* ("Title IX"), 3) sex discrimination in violation of the Pennsylvania Human

Relations Act, 43 Pa. Stat. § 951 *et seq.* ("PHRA"), 4) retaliation in violation of Title VII; 5)

retaliation in violation of Title IX, 6) retaliation in violation of the PHRA, 7) hostile work

environment in violation of Title VII, 8) hostile work environment in violation of Title IX, and 9)

hostile work environment in violation of the PHRA.[2] See First Am. Compl. (ECF No. 22).

---

[1] Dr. Baugh also sued John Turchek and Patrick Laverty. On April 11, 2017, the parties filed a stipulation of dismissal with prejudice as to Professor Turchek and Dr. Laverty. (ECF No. 32).
[2] Dr. Baugh also alleged a state law civil conspiracy claim against the defendants in the first amended complaint. On April 17, 2017, the parties filed a stipulation of dismissal with prejudice of the state law civil conspiracy claim. (ECF No. 33).

RMU filed a brief in support of its motion (ECF No. 36), a concise statement of material facts (ECF No. 37), an appendix of record evidence (ECF No. 38), a reply brief in support of its motion (ECF No. 53), a reply statement of undisputed material facts (ECF No. 54), and a supplement to its appendix (ECF No. 55). In response to RMU's motion, Dr. Baugh filed a response in opposition (ECF No. 48), a response to RMU's statement of facts (ECF No. 50), a response to the motion for summary judgment (ECF No. 44), an appendix to the response in opposition (ECF No. 56), and a surreply to RMU's reply statement of undisputed material facts (ECF No. 62). Together the parties filed a combined concise statement of material facts (ECF No. 59).

This matter is fully briefed and ripe for disposition. As more fully explained below, RMU's motion for summary judgment will be granted in part and denied in part.

**I. Standard of Review**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The parties must support their respective positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

In reviewing the evidence, the court draws all reasonable inferences in favor of the nonmoving party. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000);

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Huston v. Procter & Gamble Paper Prod. Corp., 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. See Anderson, 477 U.S. at 255; Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004); Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 247-48. An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with respect to that issue. See id. "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587; Huston, 568 F.3d at 104.

## II. Relevant Facts[3]

RMU is a nonprofit academic institution located in Moon Township, Pennsylvania. (ECF No. 59 at 1, RMU's SOF 1). Dr. Baugh accepted an appointment as an associate professor in RMU's Computer Information Systems ("CIS") Department on January 27, 2001. (Id. at 3; RMU's SOF 9). On May 5, 2006, Dr. Baugh was promoted to the rank of professor. (Id. at 3, RMU's SOF 10). In 2013, Professor John Turchek ("Professor Turchek"), the CIS Department head, recommended Dr. Baugh for promotion to the rank of university professor, RMU's highest faculty rank, noting: "[b]ased on Professor Baugh's continued record of exemplary performance in the areas of scholarship, teaching and service … I strongly recommend Professor Baugh for promotion to University Professor." (ECF No. 38-4, Ex. D at 112). On April 29, 2013, Dr.

---

[3] This section reviews the facts relevant to RMU's motion for summary judgment. If the parties agree on a fact, the court will cite to the relevant page and paragraph in the parties' combined concise statement of material facts (ECF No. 59). If a party disputes a fact alleged by the other party, the court will cite to the specific evidence of record that supports the fact in question.

Baugh was promoted to the rank of university professor, based in part on "positive recommendations from your … department head [Professor Turchek]." (Id. at 113). Professor Turchek also recommended Dr. Baugh for merit increases every year since he became the department head. (ECF No. 38-3, Ex. C at 46).

RMU is a signatory to a collective bargaining agreement ("CBA") with the Robert Morris University Faculty Federation, Local 3412, AFT, AFL-CIO ("Federation"), a labor union which represents RMU's full-time faculty members. (ECF No. 59 at 2, RMU's SOF 3). As a full-time faculty member, Dr. Baugh is a member of the Federation bargaining unit. (ECF No. 38-3, Ex. C at 32). The CBA contains a grievance procedure, which contains four steps and culminates in arbitration. (ECF No. 59 at 2, RMU's SOF 4). Grievances only adjudicate potential violations of the CBA. (ECF No. 48-3 at App. H00007).

Professor Turchek has been the CIS Department head since May 2011. (ECF No. 59 at 2, RMU's SOF 5). As department head, Professor Turchek is responsible for making recommendations concerning the hiring and promotion of faculty members, scheduling courses, assigning faculty members to their "regular load" of courses, and making recommendations concerning merit raises for faculty members.[4] (Id. at 2, RMU's SOF 6).

At the time Professor Turchek became the department head of RMU's CIS Department there were three to five female professors in the department. (Doc. 38-5, Ex. E at 114). Currently

---

[4] Dr. Baugh states Professor "Turchek is only permitted to assign faculty their regular course loads [if] they are qualified to teach the courses as outlined in the Union contract and in support thereof, cited to "Baugh Dep. Ex. 5 App.C.3; App.C.11; App.G.19." (ECF No. 59 at 2, Baugh's Resp. to RMU's SOF 6). Baugh Dep. Ex. 5 is the 101-page CBA. (See ECF No. 48-1, App. A). App. C is Dr. Baugh's deposition transcript. (See ECF No. 48-2, App. C). App. G is Barbara Levine's deposition transcript. (See ECF No. 48-3, App. G). None of the specific pages cited by Dr. Baugh in appendices C and G support the statement and the court's review of the 101-page CBA did not find support for the statement. Accordingly, the court cannot take this "fact" into account in deciding RMU's motion for summary judgment. The plaintiff is reminded that the court should not have to search the record to see if it can find support in the record for a party's factual assertions. See Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n. 3. (3d Cir. 2006) ("Judges are not like pigs, hunting for truffles buried in the record.").

there are approximately ten female professors in the department.  (ECF No. 59 at 22, RMU's SOF 83).

At RMU, a "regular load" consists of twelve academic credits per semester.  (Id. at 4, RMU's SOF 16).  Any course taught in addition to a professor's regular load is called an overload course. Additional compensation is paid for teaching an overload course. (ECF No. 48-2 at App. C00008). Dr. Baugh teaches both undergraduate and graduate level JAVA courses at RMU and has done so for many years. (ECF Nos. 38-5 at Ex. E at 6; 48-2 at App. C00013). Dr. Baugh is qualified to teach graduate level computer programming courses based upon her education and experience. (ECF No. 59 at 30, Baugh's SOF108).

**A.  Fall 2013 semester INFS6151 course assignment**

For the fall 2013 academic semester, Professor Turchek scheduled a graduate level JAVA course, INFS6151, (the "INFS6151 Course") to be taught "on-ground" at RMU's Pittsburgh Center location, located in downtown Pittsburgh, Pennsylvania on Wednesday evenings. (ECF No. 59 at 5, RMU's SOF 17). "On-ground" means the course is being taught in person.  (Id. at 5, RMU's SOF 18).  Prior to the fall 2013 academic semester, Dr. Baugh had taught the INFS6151 Course at RMU for nine years.  (Id. at 5, RMU's SOF 19).

Professor Turchek decided that the fall 2013 semester INFS6151 Course would be taught using the IBM Enterprise Mainframe ("Mainframe") system, because members of the computer and information systems business community in Pittsburgh, Pennsylvania, including Highmark, U.S. Steel, UPMC, Bank of New York, and PNC, had advised him that they used the JAVA application on the Mainframe system. (ECF No. 38-5, Ex. E at 23).  Professor Turchek discussed the change in the INFS6151 Course with a few professors in the CIS Department, but not with Dr. Baugh or any other female faculty member.  (ECF No. 48-4 at App. J00005).

On June 5, 2013, in order to facilitate CIS Department faculty members learning and gaining experience with the Mainframe system, Professor Turchek invited all department faculty members, including Dr. Baugh, to attend a training session at Fairmont State University ("Fairmont State"), in Fairmont, West Virginia, on July 9-12, 2012.  (ECF No. 59 at 6, RMU's SOF 21). Professor Turchek sent an email to all CIS Department professors, including Dr. Baugh, telling them that "IBM will be providing some mainframe training July 9-12 in Fairmont, WVA" and to let him know if they wanted to attend the training and which days they wanted to attend.  (ECF No. 38-4, Ex. D, at 115-116).  Topics included: "Rational Developer for COBOL, JAVA, and other programming languages." (Id. at 116).  Dr. Baugh chose not to attend the training.  (ECF No. 38-3, Ex. C at 67-68).  Professor Turchek did not tell Dr. Baugh that if she did not attend the conference at Fairmont State, she would be precluded from teaching the INFS6151 Course in the fall 2013 semester.  (ECF No. 48-4 at App. J00014).

RMU Professor Patrick Laverty ("Dr. Laverty") attended the training session at Fairmont State. (ECF No. 59 at 6, RMU's SOF 22).  He reported that the training did not involve JAVA; rather, the training involved COBOL.  (Id.; ECF Nos. 48-2 at App. E00018; 48-3 at App. F00005). Dr. Laverty had prior experience using the Mainframe system and according to Professor Turchek, was "one of our lead people for teaching things on the mainframe." (ECF No. 59 at 6, RMU's SOF 23). RMU Professor Paul Kovacs ("Dr. Kovacs") also attended the training session at Fairmont State. (ECF No. 48-2 at App. E00018).  Dr. Kovacs confirmed that the training was about COBOL, not JAVA. (Id.). A second training session took place during the summer of 2013, at IBM in Poughkeepsie, New York.  (ECF No. 48-2 at App. E00004-00005). Professor Turchek only invited male faculty members, including Dr. Laverty, to attend that session. (Id.).

Pursuant to the CBA, professors can request to teach certain classes and have certain teaching schedules. To the best of Professor Turchek's knowledge, Dr. Baugh did not request to teach the INFS6151 Course "on-ground" for the fall 2013 semester. (ECF No. 48-4 at App. J00017). Dr. Baugh did request, for the fall 2013 semester, that she not be assigned to teach a class on Wednesday evenings. (ECF 38-5, Ex. E at 18, 53).

When the time came to assign classes for the fall 2013 term, Professor Turchek assigned Dr. Laverty his "regular load" of classes and Dr. Baugh her "regular load" of classes. (ECF No. 59 at 8, RMU's SOF 29-30). Professor Turchek assigned the INFS6151 Course to Dr. Laverty, to be taught in downtown Pittsburgh on Wednesday evenings, as part of his "regular load." (ECF 38-5, Ex. E at 16-17). Professor Turchek did so because Dr. Laverty had experience using the Mainframe system, had attended the training session at Fairmont State, had requested to teach the course "on-ground," and was not opposed to teaching the course on Wednesdays. (Id. at 17-18, 180-81). Professor Turchek told Dean Levine that Dr. Laverty was the only faculty member trained in the WebSphere/Enterprise system and therefore, Dr. Laverty was the only one qualified to teach the course that had that component. (ECF 38-7, Ex. G at 49). In fact, neither Dr. Laverty nor Dr. Baugh had experience with WebSphere. (ECF Nos. 48-4 at App. K, ¶ 6; App. F00010). At the time of the assignment, Dr. Laverty did not have graduate faculty status and Dr. Baugh did have graduate faculty status. (ECF No. 48-5 at M00065-00066). Dr. Baugh was initially approved for graduate faculty status in June 2005; Dr. Laverty was initially approved for graduate faculty status in October 2013. (Id.).

Dr. Baugh learned on August 4, 2013, that the fall 2013 semester INFS6151 Course had been assigned to Dr. Laverty. (ECF No. 59 at 8, RMU's SOF 31). Upon learning about the assignment, Dr. Baugh complained to Dean Barbara Levine ("Dean Levine"), Professor Turchek's direct supervisor. (Id. at 8, RMU's SOF 32). Dr. Baugh also sent an email to

Professor Turchek, complaining about the number of overload graduate courses assigned to others, including Dr. Laverty, and that she had not been assigned to teach any graduate courses for the 2013 semester. (ECF No. 38-4 at 114). This disparity meant a large difference in overload pay to Dr. Laverty as compared to Dr. Baugh since a professor received $1300 in extra compensation for each graduate level course, such as the INFS6151 Course, taught per semester. (ECF Nos. 38-3, Ex. C at 54-55; 38-4, Ex D at 114; 48-5 at App. M00040).

Prior to 2013, Dr. Laverty had not taught a basic JAVA course. (ECF No. 48-3 at App. F00009). He had taught the most advanced JAVA course in the RMU curriculum, secure programing, for approximately ten years. (Id.). He explained, "[t]here's a big difference between introductory Java and teaching advanced courses." (Id.). In a letter written to IBM, Dr. Laverty referred to himself as "a Java newbie," although he stated that he probably should have said he was a "Java Enterprise newbie because I had not used at that point, WebSphere." (Id. at App. F00010).

Based upon Dr. Baugh's complaint to Dean Levine, Dean Levine came up with the idea that Dr. Baugh could co-teach the INFS6151 Course with Professor Laverty for the fall 2013 semester "so that Dr. Baugh would be able to continue to teach JAVA with [the] WebSphere or Enterprise systems . . . component going forward." (ECF No. 38-7, Ex. G at 46). Dr. Baugh agreed to team teach with Dr. Laverty. (ECF Nos. 59 at 9, RMU's SOF 34; 38-3, Ex. C at 63). After the first class, however, Dr. Baugh resigned from teaching the class with Dr. Laverty because he was treating Dr. Baugh "like his secretary." Id.

### B. Spring 2014 semester INFS6151 Course assignment

On September 12, 2013, Professor Turchek sent Dr. Baugh an email concerning the courses he was planning to assign Dr. Baugh to teach in the spring 2014 semester; one of the

courses listed in the email was the INFS6151 Course. (ECF No. 48-5 at App. M00130). Later in the evening on September 12, 2013, Dr. Baugh gave Professor Walt Pilof ("Professor Pilof"), a union representative, a copy of the grievance she planned to file concerning Professor Turchek's assignment of the INSF6151 Course to Dr. Laverty for the fall 2013 semester. (Id. at App. M00131; 48-2 at E00016). On September 13, 2013, Dr. Baugh received from Professor Turchek an email that contained her spring 2014 semester teaching schedule "prior to overloads." (ECF No. 48-5 at App. M00132). Later in the day on September 13, 2013, Professor Turchek sent an email out to all instructors in the CIS Department with a list of all unassigned courses, which included the INFS6151 Course, and a form to be completed with respect to what overload courses a professor wanted. (Id. at App. M00133). In the end, Professor Turchek did not assign Dr. Baugh to teach the INFS6151 Course in the spring 2014 semester. (Id. at M00113).[5] Dr. Baugh was assigned two other JAVA courses for the spring 2014 semester: (1) JAVA Programming and (2) Advanced JAVA: Application Programming. (ECF No. 55-1, Ex. A ¶ 5).

Dr. Baugh filed her grievance concerning Professor Turchek's assignment of the fall 2013 semester INFS6151 Course to Dr. Laverty on September 23, 2013. Her grievance included a claim of sex discrimination and demanded: (1) she be paid for the course even though she was not team teaching it with Dr. Laverty, (2) "some kind of statement" be made "that all genders and races are to be included in new programs if they wish to participate," and (3) "course changes or program content changes are to be discussed with all interested parties within the department before they are implemented." (ECF Nos. 48-5 at M00009; 59 at 9, RMU's SOF 37). At a September 24, 2013 meeting regarding her grievance, RMU Associate Dean Dave

---

[5] This document, found at M00113, was drafted by Dr. Baugh and states that the INFS6151 Course was pulled from her assigned list of courses for spring *2013*. (ECF No. 48-5 at App. M00113). Upon review of the entire document, however, it is clear that this is a typographical error and that Dr. Baugh intended to state that the INFS6151 Course was pulled from her assigned list of courses for spring *2014*.

Wood ("Dr. Wood") told Dr. Baugh that her gender discrimination claim was "laughable," he was "insulted by this" and that Dr. Baugh was a liar. (ECF Nos. 48-2 at App. C00076-00077, 48-4 at App. K, ¶ 11, 59 at 39-40, Baugh's SOF 139, RMU's Response to Baugh's SOF 139).

The grievance regarding the INFS6151 Course assignment was settled on January 23, 2014, between Dr. Baugh, the Federation, and RMU. (Id. at 9, RMU's SOF 38-39). In an interoffice memorandum concerning the grievance dated January 23, 2014, David Jamison, Provost and Senior Vice President for Academic Affairs ("Provost Jamison") (sitting by designation of RMU's President) explained to Dr. Baugh: "Dean Levine's finding in regard to the assignment of overloads in the prior semester is affirmed: the proper process was not followed, and the process will be required to be corrected in a manner consistent with the collective bargaining agreement." (ECF No. 55-3, Ex. C at 2). Provost Jamison explained that "[a]lthough I find that the teaching assignment for INFS6151 was made in an irregular manner, I did not find evidence of gender-based discrimination in that assignment." (Id.). Finally, Provost Jamison instructed: "[t]he Department of Computer and Information Systems [i.e., Professor Turchek] will be reminded of the importance of faculty consultation with all interested faculty in making course or program content changes." (Id.). As part of the settlement, RMU paid Dr. Baugh $3,424.00, which was the amount she would have been paid had she taught the INFS6151 Course and which Dr. Baugh accepted and retained. (ECF No. 59 at 9, RMU's SOF 38-39).

On February 3, 2014, Dr. Baugh sent a response to Provost Jamison with respect to his conclusions in the January 23, 2014 memorandum. (ECF No. 48-5 at App. M00007). Concerning his conclusion that there was no evidence of gender discrimination, Dr. Baugh wrote, "in an effort to resolve this grievance, I will agree to disagree with you on the gender issue and will accept your other findings and end the process at this step." (Id.). Having been

paid as if she had taught the INFS6151 Course, Dr. Baugh's monetary loss as a result of not teaching the INFS6151 Course in the fall 2013 semester, was the interest she would have made on the funds between the time when she would have been paid had she taught the course and when she was paid. (ECF Nos. 38-3, Ex. C at 229; 48-4 at App. K00003, ¶ 18).

### C. Dr. Baugh's fall 2014 semester teaching schedule

On March 11, 2014, Professor Turchek emailed Dr. Baugh a tentative schedule for the fall 2014 semester that had Dr. Baugh teaching two courses on a Monday/Wednesday/Friday ("M/W/F") schedule and one course on a Wednesday night. (ECF Nos. 48-5 at App. M00148; 59 at 13, RMU's SOF 48). Prior to the fall 2014 academic semester, Dr. Baugh had always taught a Tuesday/Thursday ("T/Th") schedule at RMU. (ECF No. 59 at 13, RMU's SOF 49). On March 11, 2014, Dr. Baugh replied to Professor Turchek via email, asking "Why have you given me a MWF schedule? I have never had this in all of the 13 years I have been at RMU?" (Id.).

By March 12, 2014, Dean Levine, Peter Faix ("Mr. Faix"), RMU's Vice President for Human Resources, and Provost Jamison were aware of Dr. Baugh's complaint about her fall 2014 semester M/W/F teaching schedule. (ECF No. 48-4 at App. J00039). On March 12, 2014, Dean Levine wrote an email to Professor Turchek explaining that Dr. Baugh had written "a strong note" to Mr. Faix and Provost Jamison wherein she complained about being scheduled to teach a M/W/F schedule and opined that the change was in retaliation for the grievance she filed with respect to Professor Turchek assigning the INFS6151 Course to Dr. Laverty to teach for the fall 2013 semester. (ECF No. 48-4 at App. J00039). In the email, Dean Levine inquired about whether Professor Turchek had ever told the CIS faculty "that they cannot expect to have a particular schedule every semester," and stated "[w]e do not believe this is retaliatory nor that

faculty are entitled to a particular schedule every semester" and "[w]e are not sympathetic to her way of thinking about this." (Id.).

On March 13, 2014, Professor Turchek replied to Dean Levine via email. (ECF No. 48-4 at App. J00040). In the email, Professor Turchek explained he had received an email from Dr. Baugh about the issue, he had had three female faculty members come to him the prior semester specifically citing Dr. Baugh's schedule and requesting a T/Th "preferred scheduling," like Dr. Baugh's schedule, and not only had he never told faculty members "that they could have the same schedule every semester," to the contrary, "due to the number of new courses, new programs, new locations, etc., I have said many times that I cannot simply do as other Department Heads and simply change the dates on the Excel Spreadsheets and use last year['s] schedule or last semester's schedule." (Id.). On March 28, 2014, Dean Levine told Dr. Baugh in an email: "I discussed with John Turchek where fall 2014 scheduling stands. From the information John provided, I am satisfied that John followed the provision of the CBA on arranging schedules. John solicited faculty input, provided a schedule planner and consulted with faculty via email, the process he typically employs. He also took into account students' and the University's needs." (ECF No. 48-5 at App. M00151).

What was not shared with Dr. Baugh was that as a result of Dr. Baugh's complaining to Dean Levine about Professor Turchek assigning the INFS6151 Course to Dr. Laverty for the fall 2013 semester, and ultimately filing the grievance with respect to the assignment, Dean Levine had found out in the fall/winter of 2013-2014 that there were faculty members in the CIS Department who always were given a M/W or T/Th class schedule and who never were given a M/W/F class schedule. (ECF No. 48-3 at App. G00014, G00018, G00028-00030). Dean Levine opined that this scheduling was unfair to younger faculty members, who were being assigned the

12

M/W/F classes, and so she instructed the heads of the departments she supervised, which included Professor Turchek, "that they indeed must make sure the schedules are fairly distributed across all faculty members and that no one can have a lock on a Tuesday/Thursday schedule." (Id. at G00014, G00018).

Ultimately, Professor Turchek changed the fall 2014 semester schedules of eight faculty members in the CIS Department: (1) Dr. Baugh; (2) Gary Davis ("Dr. Davis"); (3) Dr. Kovacs; (4) Professor Pilof; (5) Peter Wu; (6) Peter Draus; (7) Natalya Goreva; and (8) Karen Paullet ("Dr. Paullet"). (ECF Nos. 38-2, Ex. B, ¶ 7; 38-9, Ex. I at 39, 70; 38-10, Ex. J at 13; 48-1 at App. E00021; 48-2 at App. C00025; 48-4 at App. I00004; 56 at App. D00004). Dr. Davis, Dr. Kovacs, and Dr. Paullet all opined at their depositions that the changes made to everyone's fall 2014 semester schedules were because Dr. Baugh had filed a grievance against Professor Turchek. (ECF Nos. 38-10, Ex. J at 13; 48-2 at App. E00039; 56 at App. D00006). By way of example, Dr. Kovacs stated: "[I]s it a coincidence that Dr. Baugh files a grievance and right after that there's a massive change in scheduling, which everyone had their schedule for years? So I mean, cause and effect." (ECF No. 48-2 at App. E00039). Other than Dr. Baugh, no other faculty members filed a grievance complaining that the schedule changes were discriminatory or retaliatory. (ECF No. 59 at 13, RMU's SOF 47).

The M/W/F schedule did not make sense for programming courses like the ones Dr. Baugh taught because it took approximately fifteen minutes for the equipment and software to boot every class. (ECF No. 48-2 at App. E00020). Therefore, forty-five minutes of class time was lost weekly on a M/W/F schedule as opposed to thirty minutes of lost class time on a T/Th or M/W schedule. (Id.).

At his deposition, Professor Turchek stated that he changed Dr. Baugh's schedule from T/Th to M/W/F for the fall 2014 semester because he was given orders to do so from his superiors/human resources. (ECF No. 55-3, Ex. E at 111-112). "I was told by my superiors, told by HR, human resources, to make sure I change things and get more balance across the department." (Id.).

**D. Summer 2014 session ethics course assignment**

Pursuant to the CBA, summer teaching assignments are determined on the basis of seniority except that seniority is overcome by a "right of first refusal" with respect to teaching online courses. (ECF Nos. 48-5 at App. M00001; 59 at 14, RMU's SOF 52). Consistent with these policies, RMU CIS Department professor Fred Kohun ("Dr. Kohun") bid on and was assigned a CIS Department online ethics course assignment for the summer 2014 session. (ECF No. 59 at 14, RMU's SOF 53). Dr. Kohun has more seniority at RMU than Dr. Baugh. (Id. at 14, RMU's SOF 54).

After being assigned the ethics course, but prior to teaching it, Dr. Kohun instructed RMU's Registrar to change the name of the professor of record to Vladimir Burcik ("Dr. Burcik"), a part-time RMU instructor who resided in Slovakia. (Id. at 14, RMU's SOF 55). Dr. Baugh became aware of the change in instructors for the ethics class and told Professor Turchek in an email, that if Dr. Kohun had given up the class, she would like to teach it and so requested that the course be put out to bid as mandated by the CBA. (ECF Nos. 38-3 at Ex. C. at 102; 48-2 at App. C00042).

Upon being told by Dr. Baugh that the professor of record for the ethics course had been changed, Professor Turchek asked the Registrar how Dr. Burcik had been added as the instructor for the on-line ethics course. (ECF No. 48-4 at App. J00029). The Registrar told Professor

Turchek that Dr. Kohun and Bob Skovira ("Dr. Skovira") had come in and told him to change the names of the instructor on two courses they were assigned to teach, one being the ethics course, to Dr. Burcik; "Something about they couldn't be doing things because they were traveling and wanted him to handle it for a while, something to that extent." (Id.). Professor Turchek instructed the Registrar to change the professor of record on the ethics course back to Dr. Kohun because Dr. Kohun had picked the course and was "supposed to be teaching it." (ECF No. 38-5, Ex. E at 161). Ultimately, Dr. Kohun taught the summer 2014 session ethics course, stating to Dr. Baugh that he "didn't plan to teach the course but now he had to."[6] (ECF Nos. 38-1, Ex. A, ¶ 9; 48-4 at App. K, ¶ 16).

Professor Turchek had saved courses for various part-time faculty in the past, including Dr. Burcik. (ECF Nos. 48-2 at App. C00036-00037; 48-4 at Apps. I00006-00008, J00016-00017). Dr. Baugh had been asked once by Professor Turchek to bid on a class and then drop it so that Dr. Burcik could teach it. (ECF No. 48-2 at App. C00036). Dr. Paullet was told once by Professor Turchek not to bid on a course because he wanted Dr. Burcik to be able to teach it; additionally, another time Dr. Paullet was asked by Professor Turchek to bid on a course and then drop it so that a part-time professor, Chris Teodorski, could teach it. (ECF Nos. 48-4 at App. I00006 and I00009). Professor Turchek explained that "there could be a situation where we said [to a full-time faculty member], look, can you handle -- when you pick your courses, make sure we can handle some part-timers. That might have happened . . . So we can have some part-

---

[6] RMU contends that this evidence is inadmissible hearsay and cannot be considered by the court in deciding its motion. (ECF No. 59 at 33, RMU's Resp. to Baugh's SOF 117) (citing Fed.R.Evid. 801). The court disagrees. Federal Rule of Evidence 801(d) provides that a statement is not hearsay if "[t]he statement is offered against an opposing party" and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed.R.Evid. 801(d)(2)(D). Therefore, because Dr. Kohun was an RMU professor discussing the assignment of a course to him to teach at RMU, a matter clearly within the scope of the relationship between Dr. Kohun and RMU, this statement is not hearsay and can be considered by the court in deciding RMU's motion for summary judgment.

timers teach some of our courses that we like to go and see them teach." (ECF No. 48-4 at App. J00017).

On July 28, 2014, Dr. Baugh filed a grievance concerning the assignment of the summer 2014 session ethics course, in which she alleged that she should have been assigned the course because Dr. Kohun never intended to teach it. (ECF Nos. 48-5 at App. M00064; 59 at 17, RMU's SOF 63). As part of the grievance process, the Federation requested information from RMU about the ethics course, as well as a second course which also had been assigned to Dr. Burcik to teach in the summer 2014 session. (ECF No. 48-5 at App. M00054). In response, RMU explained that Dr. Kohun and Dr. Skovira personally visited the Registrar's office on June 12, 2014, and requested that the instructor's name be changed to Vladimir Burcik with respect to INFS4170 (the ethics course) and INFS6226. (Id.). RMU explained: "On Saturday, June 14, Department Head John Turchek was informed of this change by the Registrar. On Sunday, June 15, Mr. Turchek instructed the Registrar to reinstate Kohun as the faculty for 4170 and Skovira as the faculty for 6226, and [the Registrar] did so on the same day." (Id.).

Ultimately, RMU and the Federation resolved Dr. Baugh's grievance concerning the assignment of the ethics course, and the grievance was not pursued to the next step, arbitration. (ECF No. 59 at 17, RMU's SOF 64). On January 12, 2015, Provost Jamison, on behalf of RMU, sent Dr. Baugh an email explaining in relevant part:

(1) Dr. Jacob's determination that no violation of the Contract occurred in the Registrar's response to the course assignment requests initiated by Drs. Kohun and Skovira is affirmed. However, it is clear that an error in process occurred. Therefore, Dr. Jacob's recommendation is adopted. **The Provost will consult with the Registrar to develop clear policies for access requests in Patriot to prevent a recurrence of such a process error.**

(2) **The second recommendation from the Step 2 hearing is also adopted. The Department will develop guidelines for determining the number of overloads that can be assigned to a single faculty member.**

(ECF No. 55-3, Ex. C at 5) (emphasis in original).

**E.  Dr. Laverty's "right of first refusal" to teach the INFS6151 Course online**

Pursuant to the CBA: "only faculty members who are qualified to teach a particular online program course can select such course during the departmental summer course selection process. In addition, during each round of the departmental summer course selection process, a faculty member *who has been paid* to develop an online course within the past three (3) years can select this course at the start of each round of selection . . . ."  (ECF No. 38-4, Ex. D at 46) (emphasis added). This preference is referred to by the parties as the "right of first refusal." (ECF No. 59 at 18, RMU's SOF 66).  The CBA also requires that: "[a]ny online program course development payments shall be made to the faculty member after: (1) completion of course development by the faculty member, and (2) evaluation of the development results by the academic department head and appropriate RMU personnel to ensure that the developed course meets or exceeds [certain enumerated] minimum quality standards. . . ."  (ECF No. 38-4, Ex. D at 46-47).

Sometime in or before the spring 2014 semester, Professor Turchek asked Dr. Laverty to make changes to the online INFS6151 Course and develop the shell for the redesigned class. (ECF No. 38-5, Ex. E at 87).  Professor Turchek did not request any input from Dr. Baugh even though he knew she had an interest in the INFS6151 Course, having taught it for nine years prior to Professor Turchek assigning it to Dr. Laverty for the prior fall semester and having filed a grievance over the INFS6151 Course being taken away from her and assigned to Dr. Laverty. (ECF No. 48-4 at App. K00003, ¶ 14).  Dr. Laverty redesigned the INFS6151 Course by "add[ing] the topics that I did, with the Enterprise stuff;" and developing "support materials,

hands-on assignments with support," all which took "a considerable amount of time." (ECF No. 38-8, Ex. H at 134-135).

Based upon Dr. Laverty's redesign of the online INFS6151 Course, Professor Turchek gave Dr. Laverty the right of first refusal with respect to the course. (ECF No. 48-4 at App. K00003, ¶ 14). Dr. Laverty exercised the right of first refusal with respect to the INFS6151 Course for the summer 2014 session. (ECF No. 59 at 19, RMU's SOF 69). Dr. Baugh learned about Dr. Laverty's right of first refusal with respect to the INFS6151 Course on or about March 5, 2014. (ECF No. 48-5 at App. M00073). In undated CIS Department meeting minutes, several of which contain a status report on new online shell developments being worked on within the CIS Department, Professor Laverty is only listed as developing a new INFS6830 online course, not a new INFS6151 online course. (ECF No. 48-5 at App. M00044-00050). Dr. Laverty was not paid for the redesign of the INFS6151 Course until May, 2014. (Id. at App. M00077).

On August 1, 2014, Dr. Baugh filed a grievance with respect to Professor Turchek giving Dr. Laverty the right of first refusal on the INFS6151 Course. (ECF No. 38-3, Ex. C at 123). Her grievance did not allege that Professor Turchek's action was discriminatory in nature. (ECF No. 59 at 19, RMU's SOF 72).

On October 8, 2014, the Federation, Dr. Baugh, and RMU agreed to resolve the grievance, and RMU paid Dr. Baugh $3,150.00, an amount in excess of the amount requested by Dr. Baugh. (Id. at 20, RMU's SOF 73). Dr. Baugh accepted and retained the $3,150.00. (Id. at 20, RMU's SOF 74). Additionally, on January 12, 2015, Provost Jamison directed that the CIS Department [i.e., Professor Turchek] take the online INFS6151 Course through the course/curriculum revision and approval process mandated by the CBA. (ECF No. 55-3, Ex. C at 5).

F.  **January 2015 CIS Department meeting**

Professor Turchek supported RMU's Enterprise Certificate Program because members of the local computer and information systems business community had informed Professor Turchek that there was a need for job applicants with background using IBM's Enterprise systems.  (ECF No. 38-2, Ex. B, ¶ 8).  To the contrary, Dr. Baugh considered the Enterprise Certificate Program a failed program and over the course of a number of CIS monthly department meetings, repeatedly asked Professor Turchek for enrollment figures in the program. (ECF Nos. 48-2 at App. C00056; 59 at 21, RMU's SOF 77).  One such meeting was the December 2014 CIS Department meeting, where one of the topics discussed was eliminating classes.  (ECF No. 48-2 at App. C00104). To facilitate the decision, Dr. Baugh requested that Professor Turchek provide how many students were in the CIS Department's majors, certifications, programs, etc., including the Enterprise Certificate Program. (Id. at App. C00104-00106).  Dr. Pilof and Dr. Kohun, both males, agreed with Dr. Baugh at the meeting that seeing the numbers would be helpful.  Id.  Without yelling at anyone, Professor Turchek agreed to provide the information requested, but at the next meeting, on January 21, 2015, he did not provide the numbers for the Enterprise Certificate Program as promised. (Id.).

Dr. Baugh complained at the January 21, 2015 CIS Department meeting about Professor Turchek not providing the number of students involved in the Enterprise Certificate Program. (ECF No. 48-2 at App. C00057; 48-4 at App. I00019). In response, Dr. Wood accused Dr. Baugh of "waging a personal attack" against Professor Turchek and Professor Turchek said Dr. Baugh was "beating a dead horse" over her repeated requests for enrollment figures in the Enterprise Certificate Program. (Id.).  Dr. Laverty also addressed the issue. (ECF No. 48-2 at App. C00105-00106). At this point, Dr. Baugh stopped talking. (Id.).

Dr. Paullet described Dr. Wood's treatment of Dr. Baugh at the meeting: "he's screaming at her," and "she was shut down [by Dr. Wood]." (ECF No. 48-4 at App. I00020-00021).

**G.  RMU's investigations of Dr. Baugh's complaints**

On January 23, 2015, Dr. Baugh sent an email to Yasmin Purohit ("Dr. Purohit"), RMU's Chief Diversity and Inclusion Officer and Title IX Coordinator, complaining about Dr. Wood's statements at the January 2015 CIS Department meeting. (ECF No. 59 at 22, RMU's SOF 81). Subsequently, Dr. Baugh met with Dr. Purohit and RMU's Deputy Title IX Coordinator, Bethany Neiman ("Ms. Neiman"), at which time Dr. Baugh expressed her concerns, which included both Dr.  Baugh's complaint regarding Dr. Wood's statements at the department meeting and her allegations regarding general hostility toward women in the CIS Department. (Id. at 22, RMU's SOF 82; ECF No. 48-3 at App. H000012-00013).

In response to Dr. Baugh's complaints, Ms. Neiman and Dr. Purohit conducted a preliminary investigation and interviewed the nine other female faculty members in the CIS Department.  (ECF No. 59 at 22, RMU's SOF 83; ECF No. 48-3 at App. H00011).  Dr. Paullet was interviewed. (ECF No. 48-4 at App. I00021-00022; ECF No. 38-4, Ex. D at 175).  She remembered being asked about Dr. Wood's conduct at the January CIS Department meeting but could not remember if she was questioned about anything else. (Id.). Dr. Wang was interviewed. (ECF No. 48-3 at App. H00031 and H00043-00044).  She stated that she was not sure if there was a gender problem.  (Id.).  Dr. Mishra was interviewed.  (Id.).  She opined that it was difficult to tell whether or not Dr. Baugh was treated the way she was treated because of her gender. (Id.).

After reaching out to the nine female colleagues of Dr. Baugh in the CIS Department concerning the interactions and behaviors toward women in the department, Dr. Purohit and Ms.

Neiman concluded: "we believe that while the interactions you highlighted in your report do reflect conflict and a difficult atmosphere at department meetings, the complaint is not something shared by all women in the department. Based on OCR's guidance, we believe your complaint does not rise to [the] level of a Title IX violation; therefore the Title IX Office will not be able to further investigate your report." (Id.). In other words, Ms. Neiman explained, they ended the investigation of Dr. Baugh's claim because there was no perception by the other female faculty members in the CIS Department that gender-based discrimination was occurring. (ECF No. 48-3 at App. H00013).

Ms. Neiman and Dr. Purohit offered to refer Dr. Baugh's complaint to RMU's Human Resources Department for further investigation. (ECF No. 59 at 23, RMU's SOF 86). On March 6, 2015, Dr. Baugh met with Mr. Faix of RMU's Human Resources Department and alleged that Dr. Wood had "embarrassed, intimidated and humiliated" her during the January 21, 2015 CIS Department meeting "with the intent to silence" her. (Id. at 23, RMU's SOF 87). Mr. Faix commenced an investigation into Dr. Baugh's complaint and interviewed eighteen CIS Department faculty members who had attended the January 2015 meeting. (Id. at 24, RMU's SOF 88). After conducting his investigation, Mr. Faix informed Dr. Baugh that he

> did not find any evidence to support your allegation that [Dr. Wood] embarrassed, intimidated and humiliated you, with the intent to silence you, because you are a woman. Not one of the attendees of the 1-21-15 meeting who volunteered to participate in the interviews suggested Dr. Wood treated you differently because you are a woman. In fact no one suggested [Dr. Wood] acted inappropriately at all. The consensus was that you continued to press the issue after it had already been discussed and other agenda topics were being addressed. [Dr. Wood] saying he felt this was a personal attack and recommending that the meeting move on with the other agenda topics was seen by many attendees to be an appropriate way to move the meeting forward.

(Id. at 24, RMU's SOF 89).

While Mr. Faix, Provost Jamison, Dean Levine, and Dr. Wood are all Title IX reporters, none of them reported to RMU's Title IX office potential discrimination against Dr. Baugh based upon her gender. (ECF 48-3 at App. H00016-00018).

**H. Additional facts relevant to RMU's motion for summary judgment**

Dr. Baugh could not identify the specific dates on which Professor Turchek allegedly questioned and yelled at her in CIS Department meetings; she could identify that it "usually involved me asking questions about this Enterprise program, this mainframe program" and that "[s]tarting in the Fall of 2014, Turchek started publicly berating me at many [CIS] department meetings." (ECF Nos. 48-2 at App. C00067; 48-4 at App. K0004, ¶¶ 20-21). Dr. Paullet and Dr. Davis observed Professor Turchek yelling at Dr. Baugh during department meetings. (ECF Nos. 48-4 at App. I00011; 56 at App. D00017). Dr. Davis stated that Dr. Baugh had repeatedly asked for enrollment numbers starting in the fall of 2014 all the way up to the fall of 2015. (ECF No. 56 at D00016).

Professor Turchek yelled at Dr. Kovacs on three separate occasions, including once during a 2015 CIS Department meeting when Dr. Kovacs asked a question concerning professor *emeritus* status. (Id. at 26, RMU's SOF 97). Dr. Kovacs stood up and told Professor Turchek "don't yell at me." (ECF No. 48-2 at App. E00014). In response, Professor Turchek apologized and did not take away any of Dr. Kovacs usual courses. (Id.). Professor Turchek has yelled at Dr. Davis. (ECF No. 59 at 27, RMU's SOF 98). The last time Professor Turchek yelled at Dr. Davis was in the fall of 2016 and concerned the appointment of a male adjunct faculty member.

Dr. Davis stated at his deposition that Professor Turchek does not like dissension or questioning from anyone, but that his objection becomes greater when a female is involved. (ECF No. 56 at D00012-00013). Dr. Davis explained that his statement was based upon the

experiences told to him by two female CIS Department faculty members, Dr. Wenli Wang ("Dr. Wang") and Dr. Sushma Mishra ("Dr. Mishra"). (<u>Id.</u>). He has not directly witnessed Professor Turchek acting disrespectfully towards female professors. (<u>Id.</u> at D00012). Dr. Davis stated that from the observations he made concerning Professor Turchek's dealings with faculty and the department secretary, he did not think Professor Turchek "sees them [women] on equal footing." (<u>Id.</u> at D00030). Professor Davis also stated, "[i]t seems like [Professor Turchek] kind of excludes them." (<u>Id.</u>). This statement was based upon statements made to him by CeCe, a former CIS Department secretary, concerning her interactions with Professor Turchek. (<u>Id.</u> at D00031). Dr. Davis stated that he had observed Professor Turchek be dismissive toward a former female CIS faculty member, Dr. Valerie Powell, at CIS Department meetings on multiple occasions. (<u>Id.</u> at D00034). "I kind of felt bad for her many times." (<u>Id.</u>).

Dr. Kovacs testified that Dr. Wang told him that Professor Turchek had made her cry at a performance evaluation and then made her sign the document in tears. (ECF No. 48-2 at App. E00016). He explained that Professor Turchek told him last year that he would support Dr. Wang's promotion for full professor, but ultimately did not do so, even though, in Dr. Kovacs' opinion, Dr. Wang was highly qualified for the position. (<u>Id.</u> at E00035). Dr. Kovacs testified at his deposition that "in 35 years of working in industry, education . . . I have never worked under anyone that's as aggressive as Professor Turchek." (<u>Id.</u> at App. E00037). He stated that one time when Professor Turchek yelled at him, he yelled back. He commented: "[I]f I would have been a female in that situation, I don't know if it would have been the same result." (<u>Id.</u>).

Members of the CIS Department, including Dr. Wood and Dr. Skovira, would end conversations when Dr. Baugh walked into the room. (<u>Id.</u> at App. C00070).

23

Dr. Baugh and Dr. Paullet both testified that Dr. Wood told them that Professor Turchek is a bully to females. (ECF Nos. 48-2 at App. C00057, 48-4 at App. I00027).

Dr. Wood told Dr. Kovacs that Dr. Baugh is "a liar." (ECF No. 48-2 at App. E00028).

Dr. Wood stated to Dr. Baugh and a group of doctoral students, in reference to the students taking three courses together that were taught by three female professors, including Dr. Baugh, "that it's the perfect storm." (Id. at App.C00057; 48-4 at App. K00004-00005, ¶ 27).

Professor Turchek has been told by Mr. Faix that he has anger issues. (ECF No. 48-4 at App. J00009).

### III. Legal Analysis of Defendant RMU'S Motion for Summary Judgment

    A. **Dr. Baugh's Title VII, Title IX, and PHRA sex discrimination claims- Counts I and II of Amended Complaint**

        1. **Limitations period applicable to Professor Turchek's assignment of the fall 2013 semester INFS6151 Course to Dr. Laverty**

RMU argues that summary judgment must be granted with respect to Dr. Baugh's claims of sex discrimination in violation of Title VII, Title IX, and the PHRA to the extent that these claims are based upon Professor Turchek's assignment of the INFS6151 Course to Dr. Laverty in the fall 2013 semester because those claims are time barred. Dr. Baugh concedes that her claim concerning the fall 2013 semester INFS6151 Course is time barred. Accordingly, the court will grant RMU's motion for summary judgment on Dr. Baugh's claims of sex discrimination in violation of Title VII, Title IX, and the PHRA to the extent that the claims are based upon Professor Turchek's assignment of the fall 2013 semester INFS6151 Course to Dr. Laverty.[7]

---

[7] Because Dr. Baugh concedes that her Title VII, Title IX, and PHRA sex discrimination claims concerning the fall 2013 semester INFS6151 Course assignment are time barred, it is not necessary for the court to address the remainder of RMU's arguments in support of its motion for summary judgment with respect to Dr. Baugh's claims of sex discrimination concerning the fall 2013 semester INFS6151 Course assignment to Dr. Laverty.

2. **Dr. Baugh's sex discrimination claims relative to Professor Turchek's assignment of the summer 2014 session ethics course to Dr. Kohun and the summer 2014 session INFS6151 Course to Dr. Laverty**

RMU contends that summary judgment must be granted with respect to the remainder of Dr. Baugh's sex discrimination claims against RMU because Dr. Baugh cannot establish with respect to Professor Turchek's 2014 summer session assignment of the INFS6151 Course to Dr. Laverty and the ethics course to Dr. Kohun either a *prima facie* case under Title VII, Title IX, or the PHRA or that RMU's articulated legitimate nondiscriminatory reasons for the course assignments were pretext.

As explained by Third Circuit Court of Appeals in <u>Summy-Long v. Pennsylvania State University</u>, No. 17-1206, 2017 WL 5125627 (3d Cir. 2017):

> We apply the same legal standard for all of [the plaintiff's] sex discrimination claims. Title VII and the PHRA prohibit an employer from discriminating against its employees on the basis of sex. 42 U.S.C. § 2000e-2(a)(i); 43 PA. CONS. STAT. § 955(a). Title IX applies the same prohibition to recipients of federal funds. 20 U.S.C. § 1681(a). "Following the Supreme Court's lead in turning to Title VII jurisprudence for Title IX cases, lower courts have adopted the Title VII framework to analyze Title IX [ ] claims." *Atkinson v. Lafayette Coll.*, 653 F.Supp.2d 581, 594 (E.D. Pa. 2009). This means [the plaintiff's] claims are analyzed under burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).
>
> To survive summary judgment, a plaintiff must establish a *prima facie* case by showing (1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse action, and (4) this occurred under circumstances that raise an inference of discriminatory action. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). If [the plaintiff] meets the *prima facie* test, the burden shifts to [the University] to offer a legitimate, non-discriminatory reason for its actions. *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000). If it does so, [the plaintiff] must then point to evidence from which a reasonable jury could find that the University's explanation is a pretext for discrimination and not the real motivation for its actions. *Sarullo*, 352 F.3d at 797.

<u>Summy-Long</u>, 2017 WL 5125627, at *1-2.

The appellate court has "described an adverse employment action 'as an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment'." Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (internal quotations omitted); see Jones v. Southeastern Pa. Transp. Auth., 796 F.3d 323, 326 (3d Cir. 2015).

### a.     Ethics course

RMU argues that summary judgment must be granted in its favor to the extent Dr. Baugh's sex discrimination claims are premised upon Dr. Kohun being assigned to teach the online ethics course during the summer 2014 session because Dr. Baugh cannot establish that she suffered an adverse employment action. RMU asserts that under the CBA, summer courses are assigned based upon seniority and Dr. Kohun has seniority over Dr. Baugh. Therefore, once Dr. Kohun bid on the ethics course, it was rightfully assigned to him by Professor Turchek, and Dr. Baugh did not have a right to teach the ethics course. RMU posits that while Dr. Baugh argues that Dr. Kohun never intended to teach the ethics course, because Dr. Kohun did teach the course, Dr. Baugh cannot establish that she suffered an adverse employment action.

RMU contends that Dr. Baugh cannot establish an inference of gender discrimination with respect to her not being assigned to teach the ethics course since: (1) the original assignment of the course to Dr. Kohun was based on seniority and was assigned consistent with the CBA; (2) Professor Turchek, the individual whom Dr. Baugh accuses of discrimination, directed the Registrar to change the professor of record back to Dr. Kohun as soon as he found out that, without authority, Dr. Kohun had told the Registrar to change the name of the course instructor

to Dr. Burcik (because Dr. Kohun intended to "team teach[8]" the course with Dr. Burcik); and (3) Dr. Kohun taught the course. Dr. Burcik is a male part-time RMU professor.

RMU explains that its legitimate nondiscriminatory reason for assigning the ethics course to Dr. Kohun was because he was the professor with the most seniority who bid on the ethics course. RMU contends that Dr. Baugh cannot demonstrate pretext with respect to its legitimate nondiscriminatory reason for assigning the ethics course to Dr. Kohun because there is no evidence that RMU's proffered reason for the assignment was false or that the real reason for RMU's action was discrimination.

In response, Dr. Baugh argues that she suffered an adverse employment action when Professor Turchek reassigned the ethics course to Dr. Kohun as opposed to resubmitting the course to the bid process, as required by the terms of the CBA. Dr. Baugh contends that the facts of record create an inference of sex discrimination because they establish that Professor Turchek assigned the ethics course to Dr. Burcik, a male with less seniority than Dr. Baugh, in contravention to the terms of the CBA, and then once Dr. Baugh contested the assignment, reassigned it to Dr. Kohun, who had not planned to teach the course, in order to prevent Dr. Baugh from teaching the course. Dr. Baugh contends that she has established that RMU's legitimate nondiscriminatory reason was pretext. In support of these contentions, Dr. Baugh cites to (1) Dean Levine and Professor Turchek assigning her to team teach the INFS6151 Course with Dr. Laverty, "not an instructor level decision;"[9] (2) Professor Turchek's history of

---

[8] Although RMU cites to SOF 55 and SOF 58-60 in support of its contention that Dr. Kohun intended to "team teach" the ethics course with Dr. Burcik, those statements of fact do not mention any intent on the part of Dr. Kohun to team teach the course. (See ECF Nos. 59 at 14-16, RMU's SOF 55, 58-60). RMU's SOF 55 and 58 cite to page 161 of Professor Turchek's deposition. Professor Turchek testified at his deposition that when he asked the Registrar why he had changed the name of the instructor on the ethics course, the Registrar explained that Dr. Kohun had told him that he was traveling and wanted Dr. Burcik "to handle [the class] for a while, something to that extent." (Turchek Dep. at 161, ECF No. 38-5 at 22).

[9] Dr. Baugh does not cite to any evidence in support of her contention that, "[w]hen Baugh team taught with Laverty, it was assigned by Levine/Turchek, not an instructor level decision." (ECF No. 48 at 4). The evidence of

27

saving courses for part-time faculty members by having a full-time faculty member bid on a course and then drop it so that a part-time instructor could teach it; and (3) Dr. Kovacs' statement that he "didn't plan to teach the course but now he had to." (ECF Nos. 38-1, Ex. A, ¶ 9; 48-4 at App. K, ¶ 16).

In reply, RMU asserts that there is no evidence that Professor Turchek had the Registrar assign the course to Dr. Burcik or that Professor Turchek knew that Dr. Kohun was going to have the Registrar assign the course to Dr. Burcik.

Having reviewed the facts of record, the court finds that even viewing the facts in a light most favorable to Dr. Baugh as the nonmoving party, a reasonable jury could not conclude Dr. Baugh suffered an adverse employment action under circumstances that raise an inference of discriminatory action with respect to the ethics course. A reasonable factfinder could only conclude: (1) Professor Turchek assigned the ethics course to Dr. Kohun, who had more seniority than Dr. Baugh, after he bid on the course for the summer 2014 session; (2) Dr. Kohun, without permission from or notice to Professor Turchek,[10] told the Registrar to change the professor of record for the course to Dr. Burcik; (3) upon learning about the change from Dr. Baugh, Professor Turchek contacted the Registrar, found out that Dr. Kohun had told the Registrar to change the instructor on the ethics course to Dr. Burcik, and instructed the Registrar to change the name of the instructor back to Dr. Kohun; and (4) Dr. Kohun, whether or not he planned to do so, taught the course.

---

record, even viewed in the light most favorable to Dr. Baugh does not support that Professor Turchek assigned Dr. Baugh to team teach the INFS6151 Course with Dr. Laverty for the fall 2013 term. Dean Levine stated at her deposition that she came up with the idea that Dr. Baugh could co-teach the Course with Dr. Laverty, and the parties did not dispute that Dr. Baugh agreed to do so. (ECF Nos. 38-7, Ex. G at 46; 59 at 9, RMU's SOF 34).

[10] Dr. Baugh states that Dr. Kohun and Dr. Skovira told Professor Turchek that Dr. Burcik would be handling the courses while they were traveling. (See ECF No. 48 at 3 (citing ECF Nos. 48-4 at App. J00029 and 48-5 at App. M00085, 00088-00089). The pages in the record to which Dr. Baugh cites do not support that statement. Therefore, the court cannot take this "fact" into account in reviewing RMU's motion for summary judgment. See n. 3, *supra*.

Because no reasonable jury could render a verdict in favor of Dr. Baugh on her claims of sex discrimination with respect to the summer 2014 session ethics course, RMU's motion for summary judgment on Dr. Baugh's claims of sex discrimination in violation of Title VII, Title IX, and the PHRA shall be granted to the extent those claims are based upon Professor Turchek's assignment of the 2014 summer session ethics course to Dr. Kohun.[11]

### b. INFS6151 Course

RMU argues that summary judgment must be granted in its favor to the extent Dr. Baugh's sex discrimination claims are premised upon Dr. Laverty teaching the INFS6151 Course during the 2014 summer session. It asserts that Dr. Baugh cannot establish that she suffered an adverse employment action with respect to Dr. Laverty teaching the course because Dr. Laverty had developed new course material for the online course such that under the CBA, he had the "right of first refusal" with respect to teaching the course that session. RMU contends that Dr. Baugh cannot establish an inference of gender discrimination with respect to Dr. Laverty teaching the summer 2014 session INFS6151 Course since he had the right of first refusal on the class that session and Dr. Baugh had been given the right of first refusal with respect to courses at RMU as well. Finally, RMU argues that it articulated a legitimate, nondiscriminatory reason for giving Dr. Laverty the INFS6151 Course in the summer 2014 session, i.e., he had the right of first refusal, and that Dr. Baugh cannot show pretext.

In response, Dr. Baugh explains that her theory is that Professor Turchek granted the right of first refusal to Dr. Laverty in a discriminatory fashion. She contends that she suffered an

---

[11]Having concluded that Dr. Baugh cannot establish a *prima facie* case of sex discrimination with respect to the ethics course, it is not necessary to address RMU's contention that even if Dr. Baugh can establish a *prima facie* case of sex discrimination with respect to the ethics course, summary judgment must be granted on the claim because it has articulated a legitimate nondiscriminatory reason for why Professor Kohun remained the instructor teaching the course and Dr. Baugh cannot show that a reasonable jury could find that RMU's explanation is a pretext for discrimination and not the real motivation for its action.

adverse employment action when Professor Turchek had Dr. Laverty make changes to the INFS6151 Course curriculum which gave Dr. Laverty the right of first refusal for the course for three years under the CBA and, therefore, prevented her from being able to teach the course during that time period.  Dr. Baugh argues the adverse employment action occurred under circumstances that raise an inference of discriminatory action in that Professor Turchek had Dr. Laverty redesign the course: (1) without, as required by Provost Jamison, taking the course through the approval process and allowing input from faculty like Dr. Baugh, who Professor Turchek knew was interested in the course; and (2) even though Dr. Baugh was more qualified to teach the course than was Dr. Laverty. Dr. Baugh also asserts that Professor Turchek did not follow the rules outlined in the CBA concerning what needed to be done before an instructor could be awarded a right of first refusal to a course.

In reply, RMU does not address Dr. Baugh's argument that it mischaracterized her sex discrimination claims with respect to the INFS6151 Course.

In her amended complaint, Dr. Baugh clearly alleged that RMU discriminated against her in violation of Title VII, Title IX, and the PHRA when Professor Turchek purposefully assigned the right of first refusal for the graduate level Java course Dr. Baugh had taught for nine years to Dr. Laverty, a male colleague, thereby preventing Dr. Baugh from re-gaining the course for at least three years. (See ECF No. 21 at ¶¶ 17, 45-58).  Given that RMU's motion for summary judgment does not address this aspect of Dr. Baugh's sex discrimination claims, Dr. Baugh's discrimination claims, to the extent that they are based upon RMU discriminating against her in violation of Title VII, Title IX, and the PHRA when Professor Turchek purposefully assigned the right of first refusal for the INFS6151 Course to Dr. Laverty in order to prevent Dr. Baugh from being able to teach the course for three years shall proceed to trial.

c. **Applicability of doctrine of accord and satisfaction with respect to Dr. Laverty being given the right of first refusal with respect to the INFS6151 Course**

In <u>Altman v. McHugh</u>, Civ. No. 5:11cv00061, 2012 WL 1190271 (W.D. Va. Apr. 9, 2012), the court explained:

> Accord and satisfaction is a common-law doctrine through which "'[a] claim is discharged ... when some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim.'" *O'Connor v. United States*, 308 F.3d 1233, 1240 (Fed.Cir.2002) (quoting *Case, Inc. v. United States*, 88 F.3d 1004, 1011 n. 7 (Fed.Cir.1996)) (internal quotations omitted). "In its most common form, an accord and satisfaction exists as 'a mutual agreement between the parties in which one pays or performs and the other accepts payment or performance in satisfaction of a claim or demand which is a bona fide dispute.'" *Id.* (quoting *Nev. Half Moon Mining Co. v. Combined Metals Reduction Co.*, 176 F.2d 73, 76 (10th Cir.1949)); *F.T.C. v. Namer*, No. 06–30528, 2007 WL 2974059, at *8 (5th Cir.2007). The validity of accord and satisfaction requires four elements: "(1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration." *O'Connor,* 308 F.3d at 1240; *Holland v. United States*, 621 F.3d 1366, 1382 (Fed. Cir. 2010), cert. denied, —— U.S. ——, 132 S.Ct. 365, 181 L.Ed.2d 232 (2011). The Fourth Circuit has held that "compromise and settlement is ... a subset of the larger class of 'accord and satisfaction.'" *Piver v. Pender County Bd. of Educ.*, 835 F.2d 1076, 1083 n. 3 (4th Cir.1987).

<u>Altman</u>, 2012 WL 1190271, at *9 (footnote omitted); <u>see</u> <u>Cruthirds v. Lacey</u>, No. 5:14-CV-00260-BR, 2017 WL 3754764, at *3 (E.D. N.C. Aug. 30, 2017) ("In order to establish the affirmative defense of accord and satisfaction, a defendant must prove three elements: (1) a bona fide dispute between the parties; (2) a mutual agreement between the parties to accept something other than what is due to resolve the dispute; and (3) a performance by the parties of that agreement.") (citing <u>Parker v. Prudential Ins. Co. of Am.</u>, 900 F.2d 772, 776 (4th Cir. 1990)).

Claims that are distinct from claims settled by agreement are not barred by the doctrine of accord and satisfaction. <u>See</u> <u>Strauss v. Rent-A-Center</u>, 192 F. App'x 821, (11th Cir. 2006) (holding that plaintiff's retaliation claims were not barred by accord and satisfaction because her

claims were distinct from claims settled by a consent decree which resolved only sex discrimination and sexual harassment claims and did not address any retaliation actions); <u>Cain v. Esthetique</u>, 182 F. Supp.3d 54, 64–65 (S.D.N.Y. 2016) ("'As a general rule, acceptance of a check in full settlement of a disputed unliquidated claim operates as an accord and satisfaction discharging the claim'. However, '[t]he payment of an admitted liability is not a payment of[,] or consideration for, an alleged accord and satisfaction of another and independent alleged liability'. This is because the payment of an undisputedly owed amount 'furnishes no consideration for the [ ] relinquishment or extinguishment' of an independent claim."); <u>Washam v. J.C. Penney Co.</u>, 519 F. Supp. 554, 562 (D. Del. 1981) ("'To constitute an accord and satisfaction that which is offered must clearly be offered in full satisfaction of the claim in question and it must be so understood when accepted'.") (citations omitted).

Given the court's conclusion that part of Dr. Baugh's sex discrimination claim shall proceed to trial, it is necessary to review RMU's contention that summary judgment must be granted with respect to Dr. Baugh's Title VII, Title IX, and PHRA sex discrimination claims because they are barred by the doctrine of accord and satisfaction. Focusing only on Dr. Baugh's grievance related to Dr. Laverty being given the right of first refusal to the INFS6151 Course, it is clear upon reading the grievance[12] that it did not include a claim of sex discrimination based upon Professor Turchek having Dr. Laverty redesign the INFS6151 Course such that he received the right of first refusal with respect to teaching the course for three years.[13] Therefore, because Dr. Baugh's sex discrimination claims based upon Professor Turchek giving Dr. Laverty the right of first refusal to the INFS6151 Course are independent from the claims settled by Dr.

---

[12] (<u>See</u> ECF No. 38-4, Ex. D at 144-160).
[13] Dr. Baugh did not sign a release of any and all claims, including claims of sex discrimination, when she was paid in settlement of the grievance.

Baugh's earlier grievance concerning this course, the doctrine of accord and satisfaction is inapplicable.

RMU's motion for summary judgment on Dr. Baugh's sex discrimination claims based upon the doctrine of accord and satisfaction is denied.

B. **Dr. Baugh's Title VII, Title IX, and the PHRA retaliation claims: Counts III and IV of Amended Complaint**
   1. **Retaliation in violation of Title IX**

RMU argues that summary judgment should be granted in its favor with respect to Dr. Baugh's Title IX retaliation claim because it is barred by the applicable two-year limitations period for Title IX claims. Dr. Baugh concedes that her Title IX retaliation claim is time barred. Accordingly, RMU's motion for summary judgment on Dr. Baugh's Title IX retaliation claim shall be granted.

   2. **Retaliation in violation of Title VII and the PHRA**

In Wright v. Providence Care Center, LLC, Civ. No. 17-747, 2017 WL 6059679 (W.D. Pa. Dec. 7, 2017), this court recently summarized the applicable law for determining whether a plaintiff has been retaliated against by a defendant in violation of Title VII and the PHRA: "'In order to make out a prima facie case of retaliation under Title VII/PHRA, a Plaintiff must demonstrate that: (1) she engaged in a protected activity; (2) that her employer took an adverse action against her; and (3) that a causal link between the protected activity and the employer's adverse action'." Wright, 2017 WL 6059679, at *4 (quoting Gamble v. County of Erie, Pa., Civ. No. 12-150, 2013 WL 5231470 (W.D. Pa. Sept. 16, 2013); see Boykins v. SEPTA, No. 17-1980, 2018 WL 460652, at *8 (3d Cir. Jan. 17, 2018) (explaining "[f]ollowing the Supreme Court's decision in Burlington Northern, a retaliation claim lies where any activity of the employer— including harassment sufficient to create a hostile work environment—'well might have

33

dissuaded a reasonable worker from making or supporting a charge of discrimination'.")

(citations omitted).

With respect to the first prong of a prima *facie* case of retaliation, that the plaintiff

engaged in protected activity, in <u>Davis v. City of Newark</u>, No. 10-4365, 417 F. App'x 201 (3d

Cir. 2011), the appellate court explained:

> Title VII protects "those who oppose discrimination made unlawful by Title VII."
> *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir.2006). Not every
> complaint or report entitles its author to protection from retaliation under Title VII.
> See *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68, 126 S.Ct. 2405 (noting that Title
> VII does not "set forth a general civility code for the American workplace" (internal
> quotation marks omitted)). Rather, only complaints about discrimination prohibited
> by Title VII—that is, discrimination on the basis of race, color, religion, sex, or
> national origin, 42 U.S.C. § 2000e–2—constitute "protected activity." See *Barber
> v. CSX Distrib. Servs.*, 68 F.3d 694, 701–02 (3d Cir.1995). Thus, for a complaint to
> amount to "protected activity," it must implicate an employment practice made
> illegal by Title VII. See *Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc*.,
> 450 F.3d 130, 135 (3d Cir.2006). General complaints of unfair treatment will not
> suffice. See *Barber*, 68 F.3d at 702.

<u>Davis</u>, 417 F. App'x at 202-03 (footnote omitted).

With respect to the second prong of a *prima facie* retaliation case, that the employer took

an adverse employment action against the plaintiff, "[u]nlike other provisions, the second prong

of the *prima facie* retaliation case reaches more broadly to include not just 'ultimate employment

decisions' but also materially adverse actions which are 'one[s] that well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination'." <u>Remp v. Alcon

Labs., Inc.</u>, No. CV 13-6407, 2016 WL 1161616, at *7 (E.D. Pa. Mar. 24, 2016), *aff'd,* 701 F.

App'x 103 (3d Cir. 2017) (quoting <u>Nagle v. RMA, The Risk Mgmt. Ass'n</u>, 513 F.Supp.2d 383,

390 (E.D. Pa. 2007) (citing <u>Burlington Northern & Santa Fe Ry. V. White</u>, 548 U.S. 53, 68

(2006)).

With respect to the third prong of a *prima facie* retaliation case, that there was a causal connection between the plaintiff's participation in the protected activity and the adverse employment action, in Daniels v. School District of Philadelphia, 776 F.3d 181 (3d Cir. 2015), the appellate court explained how the requisite causal connection is established:

> "We consider 'a broad array of evidence' in determining whether a sufficient causal link exists [for a plaintiff] to survive a motion for summary judgment." *LeBoon*, 503 F.3d at 232 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)). To demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if "unusually suggestive." *Id.*; *Marra*, 497 F.3d at 302. In the absence of such a close temporal proximity, we consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action. See *LeBoon*, 503 F.3d at 232–33; *Marra*, 497 F.3d at 302; *Farrell*, 206 F.3d at 280–81. The plaintiff, however, cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted. See *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir.2007); *Moore*, 461 F.3d at 351; cf. *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir.2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").

Daniels, 776 F.3d at 196–97. With respect to "temporal proximity," in Eskridge v. Philadelphia Housing Authority, No. 17-1785, 2018 WL 526485, at *3 (3d Cir. Jan. 24, 2018), the appellate court held:

> For "temporal proximity" between protected activity and an adverse action to establish causation on its own, the gap must be "very close," Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) (quoting O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001)), and we have found gaps even shorter than four months insufficient to prove causation, see LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007) ("[A] gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment.").

Eskridge, 2018 WL 526485, at *3.

a.   **Dr. Baugh's schedule change for the spring 2014 semester**

RMU contends that its motion for summary judgment must be granted with respect to Dr. Baugh's Title VII and PHRA retaliation claims to the extent that the claims are based upon Professor Turchek not assigning the INFS6151 Course to Dr. Baugh for the spring 2014 semester. RMU argues that Dr. Baugh did not suffer a materially adverse action.[14]  RMU asserts that while Dr. Baugh alleges that she was denied an opportunity to teach a JAVA course in the spring 2014 semester, in fact, she taught the course she claims she was denied the opportunity to teach. In support, RMU cites to the Declaration of Ellen Wieckowski, RMU's Vice President for Information Technology and Human Resources Information Technology, wherein she states: "[i]n the Spring 2014 academic semester, Jeanne Baugh was assigned two JAVA courses to teach: (1) JAVA Programming; and (2) Advanced JAVA: Application Programming."  (ECF No. 55-1 at ¶ 5).

In response, Dr. Baugh contends she suffered an adverse employment action when the INFS6151 Course was taken away from her in the spring 2014 semester. She asserts that she did not receive the monetary stipend for teaching a graduate JAVA course that term, she lost out on working with graduate students on her JAVA-based research, and being assigned to teach an undergraduate class as opposed to a graduate class is less prestigious.

Viewing the evidence of record in a light most favorable to Dr. Baugh as the nonmoving party, the court concludes that there is a genuine issue of material fact about whether Dr. Baugh taught the graduate level INFS6151 Course in the spring 2014 semester, the course she contends was taken away from her in retaliation for her intent to file a grievance against Professor

---

[14]   RMU does not dispute Dr. Baugh's assertion that she engaged in protected activity on September 12, 2013, when she presented her grievance to a union representative, Professor Pilof, and that same day Professor Pilof showed it to Professor Turchek.

Turchek.  Given the generality of Ms. Wieckowski's statement concerning the JAVA classes Dr. Baugh taught in the spring 2014 semester, the court cannot conclude that one of these classes was the INFS6151 Course.  Dr. Baugh taught both undergraduate and graduate JAVA courses at RMU and professors were paid more money when they taught an overload graduate level course like the INFS6151 Course than they were paid to teach an overload undergraduate course. (ECF Nos. 38-5, Ex. E at 6; 48-2 at App. C00013, C00089). Therefore, RMU's motion for summary judgment on Dr. Baugh's claims that Professor Turchek, upon learning that she intended to file a grievance against him for assigning the INFS6151 Course to Dr. Laverty for the fall 2013 semester, retaliated against her in violation of Title VII and the PHRA by not assigning the INFS6151 Course to her to teach in the spring 2014 semester must be denied.

> **b. Dr. Baugh's fall 2014 semester Monday/Wednesday/Friday teaching schedule**

RMU contends that its motion for summary judgment must be granted with respect to Dr. Baugh's Title VII and PHRA retaliation claims to the extent that the claims are based upon Professor Turchek scheduling Dr. Baugh to teach a M/W/F schedule for the fall 2014 semester in retaliation for Dr. Baugh filing a grievance against Professor Turchek on September 23, 2013. [15] RMU argues that Dr. Levine, not Professor Turchek, decided that the teaching schedules of Dr. Baugh and numerous other faculty members needed to be changed starting in the fall 2014 term in order to provide more equality amongst the faculty in terms of teaching schedules, and Dr. Baugh did not proffer any evidence that Dean Levine possessed a retaliatory animus toward her. RMU asserts Dr. Baugh, therefore, cannot establish the requisite casual connection between her protected activity and RMU's alleged adverse action.

---

[15] RMU does not dispute that changing Dr. Baugh's teaching schedule from T/Th to M/W/F was an adverse action. Accordingly, the court assumes, without deciding, that Dr. Baugh's schedule change is an "adverse action" for her retaliation claim.

Viewing the facts of record in a light most favorable to Dr. Baugh as the nonmoving party, the court concludes that there is a genuine issue of material fact about whether it was Professor Turchek or Dean Levine who decided in March 2014 that Dr. Baugh's teaching schedule was to be changed from T/Th to M/W/F. First, Dean Levine's statements are unclear about what she told Professor Turchek with respect to assigning teaching schedules. Dean Levine first testified that she "told him to change everyone's schedule who had been in a similarly situated situation," which supports RMU's position that Dean Levine was the decision maker. (ECF No. 48-3 at G00017). Moments later, she testified that she told Professor Turchek to "make sure the schedules are fairly distributed across all faculty members and that no one can have a lock on a Tuesday/Thursday schedule." (Id. at G00018). Based upon this statement, a reasonable factfinder could conclude Professor Turchek had to take Dean Levine's concern for fairness into account but that he retained the discretion to assign teaching schedules within the CIS Department as he saw fit, which supports Dr. Baugh's contention that Professor Turchek was the ultimate decision maker with respect to changing Professor Baugh's schedule for the fall 2014 semester.

Dean Levine's March 28, 2014 email to Dr. Baugh also supports the contention that Professor Turchek was the decision maker with respect to changing Professor Baugh's schedule for the fall 2014 semester. (ECF No. 38-4, Ex. D at 132). In the email, Dean Levine explained to Dr. Baugh in detail what factors Professor Turchek took into account in creating Dr. Baugh's teaching schedule. (Id.). Viewing the evidence in a light most favorable to Dr. Baugh, what is strikingly missing from the list of considerations is Dean Levine's proffered instruction to Professor Turchek to change the fall 2014 semester teaching schedules of all professors in his department who historically had a "favored" T/Th schedule to a M/W/F schedule. (Id.). Dean

Levine stated that she did not know why she did not include in the explanation that she had instructed Professor Turchek to equalize the schedules, "I think it was a more friendly way to have said it, maybe." (ECF No. 48-3 at App. G00034). Her silence with respect to her alleged mandate raises the need for a jury to resolve the "decision maker" issue.

A jury also needs to resolve whether there is a causal connection between Dr. Baugh's protected activity on September 23, 2013 and RMU's alleged adverse action on March 11, 2014. The temporal proximity between Dr. Baugh's protected conduct and the adverse action, a time span of almost six months, is not so "unusually suggestive," that the causation element of Dr. Baugh's retaliation claim is established based upon temporal proximity alone. See Mack v. Yost, 427 F. App'x. 70, 73 (3d Cir. 2011) (finding that a plaintiff had satisfied causality by alleging that adverse action was taken a week after the exercise of protected conduct); LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F. 3d 217, 233 (3d Cir. 2007) (determining that three months between the protected activity and the adverse action, without more evidence, does not "create an inference of causation and defeat summary judgment."). Nevertheless, viewing the facts of record in a light most favorable to Dr. Baugh, and considering the circumstances as a whole, there is sufficient "other evidence suggesting that [RMU] had a retaliatory animus when taking the adverse action," see Daniels, 776 F.3d at 196, such that a reasonable factfinder could conclude that there was a causal connection between Dr. Baugh's filing her grievance against Professor Turchek on September 23, 2013 and Professor Turchek changing her teaching schedule for the fall 2014 semester being changed to M/W/F on March 11, 2014. Id. Specifically, under the version of the facts most favorable to Dr. Baugh, it was during this period that Professor Turchek surreptitiously asked Dr. Laverty, a first-time instructor of the INFS6151 Course, to redesign the course, as opposed to Dr. Baugh who had taught the INFS6151 Course

the previous nine years. Professor Turchek also prematurely awarded Dr. Laverty the right of first refusal to the INFS6151 Course during this time period, which effectively blocked Dr. Baugh from teaching the INFS6151 Course for three years.[16] It was also during this time period that Dr. Baugh's grievance against Professor Turchek related to his assigning the INFS6151 Course for the fall 2013 semester to Dr. Laverty concluded. Provost Jamison determined that Professor Turchek had not followed the proper process in awarding the teaching assignment of the INFS6151 Course for the fall 2013 semester to Dr. Laverty, a conclusion which cast Professor Turchek in a negative light.

For all these reasons, RMU's motion for summary judgment on Dr. Baugh's Title VII and PHRA retaliation claims against RMU, to the extent that the claims are based upon Professor Turchek scheduling Dr. Baugh to teach a M/W/F schedule for the fall 2014 semester on March 11, 2014 in retaliation for Dr. Baugh filing a grievance against Professor Turchek on September 23, 2013, shall be denied.

### C. Dr. Baugh's Title VII, Title IX, and PHRA hostile work environment claims: Counts V and VI of Amended Complaint

A hostile work environment exists when a workplace is permeated with discriminatory intimidation, ridicule and insult so severe or pervasive as to alter the terms and conditions of the plaintiff's employment and create an abusive working environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367 (1993). To prove a *prima facie* case of hostile work environment under Title VII and the PHRA, the plaintiff must establish each of the following five elements: "1) the employee suffered intentional discrimination because of [her] sex, 2) the discrimination

---

[16] While Dr. Laverty was not paid for redesigning the INFS6151 Course until May 9, 2014, a required prerequisite under the CBA to being awarded the right of first refusal to teach a course, Professor Turchek awarded Dr. Laverty the right of first refusal to the course on or about March 4, 2014. (ECF Nos. 38-4, Ex. D at 46; 48-5 at App. M00077).

was severe or pervasive; 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." <u>Mandel v. M & Q Packaging Corp.</u>, 706 F.3d 157, 167 (3d Cir. 2013) (citation omitted); <u>Clegg v. Falcon Plastics, Inc.</u>, No. 05-1826, 174 F. App'x. 18, 24 n.6 (3d Cir. 2006) (holding, for purposes of a hostile work environment claim, that the court's Title VII analysis would apply equally to plaintiff's PHRA claim). "The first four elements establish a hostile work environment case, and the fifth element establishes employer liability." <u>Mandel v. M&Q Packaging Corp.</u>, 706 F.3d at 167 (citation omitted). "The operative elements of a *prima facie* hostile work environment claim [under Title IX] are otherwise essentially the same [as under a Title VII and PHRA claim], other than that "a plaintiff must [also] prove that the employer was deliberately indifferent to a report of discrimination … [which] is more stringent than the negligence standard that applies under Title VII." <u>Kahan v. Slippery Rock Univ. of Pa.</u>, 50 F.Supp.3d 667, 697 (W.D. Pa. 2014).

RMU asserts, among other things, that Dr. Baugh failed to adduce sufficient evidence for a reasonable jury to find the second element of her hostile work environment claims, i.e., the alleged harassment was severe or pervasive. A hostile work environment claim requires that "the harassment 'was sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment.'" <u>Walton v. Mental Health Ass'n of Southeastern Pennsylvania</u>, 168 F.3d 661, 667 (3d Cir. 1999). <u>See also Stucke v. City of Philadelphia</u>, No. 15-2303, 685 F. App'x. 150, 154 (3d Cir. 2017) ("The Supreme Court has made clear that Title VII is not 'a general civility code' and that 'the ordinary tribulations of the workplace' are not grounds for a hostile work environment claim."). In <u>Mandel v. M & Q Packaging Corp.</u>, 706 F.3d 157 (3d Cir. 2013), the appellate court explained that in determining

whether an environment is hostile because the plaintiff suffered discrimination that was either

severe or pervasive:

> a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *see also Caver v. City of Trenton*, 420 F.3d 243, 262–63 (3d Cir. 2005) ("[A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario.").

Mandel, 706 F.3d at 162; see Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990),

*superseded in part by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072

(explaining because "it is often difficult to determine the motivations of an action[,] .... [the]

discrimination analysis must concentrate not on individual incidents, but on the overall

scenario").  There is a distinction between conduct being severe and conduct being pervasive:

> We have noted that "[t]he difference [between the two standards] is meaningful" because "isolated incidents (unless extremely serious) will not amount to [harassment]." *Jensen*, 435 F.3d at 449 n. 3 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). Indeed, the distinction "means that 'severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Id.* (quoting 2 Charles A. Sullivan, Michael J. Zimmer & Rebecca Hanner White, Employment Discrimination Law and Practice 455 (3d ed. 2002)).

Castleberry, 863 F.3d 259, 264 (3d Cir. 2017).

RMU argues that summary judgment must be granted in its favor with respect to Dr.

Baugh's hostile work environment claims because Dr. Baugh's harassment claims rest on

infrequent, isolated incidents that were not initiated by her alleged harasser, Professor Turchek,

and do not establish a change in the terms and conditions of her employment. RMU contends

that Dr. Baugh's hostile work environment claims are premised upon three incidents that

occurred during an almost two-year time period. One, at a January 2015 CIS Department

meeting, Dr. Wood accused Dr. Baugh of "waging a personal attack" against Professor Turchek and of "beating a dead horse" over her repeated requests for enrollment figures in the Enterprise Certificate Program, a program which Professor Turchek supported.[17] Two, at a fall 2016 CIS Department meeting, faculty members made a motion that all participants attend future meetings in person; Dr. Baugh has attended CIS Department meetings over the phone since January 2015.[18] Three, Professor Turchek questioned and "yelled" at Dr. Baugh during unidentified CIS Department meetings.

Dr. Baugh responds that the following evidence of record shows that her working environment was both severely and pervasively hostile. Dr. Wood accused Dr. Baugh of "waging a personal attack" against Professor Turchek. (ECF No. 48-2 at App. C00057; 48-4 at App. I00019). Professor Turchek stated to Dr. Baugh that she was "beating a dead horse" when, over the course of at least three department meetings, she repeatedly requested, and never received, enrollment figures for Enterprise Certificate Program courses. (Id.). Professor Turchek[19] commented to Dr. Baugh and doctoral students who had three female professors, one of them being Dr. Baugh, that the three female teachers teaching them at one time was the "perfect storm." (ECF No. 48-2 at App. C00051; 48-4 at App. K00004-00005, ¶ 21). At a January 21, 2015 CIS Department meeting discussing the elimination of classes, Dr. Baugh was silenced by

[17] The "beating a dead horse" comment was made by Professor Turchek at the CIS Department meeting, not Dr. Wood. (See ECF Nos. 48-2 at App. C00057; 48-4 at App. I00019).

[18] More accurately, during a fall 2016 CIS Department meeting, Dr. Skovira asked why he attended the meetings in person when not everyone else did so. (Kovacs Dep. at 45; ECF No. 38-9 at 9). Dr. Baugh has not attended CIS Department meetings since the January 2015 meeting when she was silenced by Dr. Wood's statement that she was personally attacking Professor Turchek. (Baugh Dep at App. C00105-00106; ECF No. 48-2 at App. C00105-00106). Professor Turchek then suggested that it be taken to a vote whether faculty members had to attend department meetings in person. (ECF No. 38-9 at 9). Dr. Kovacs, a union representative, said the CBA did not require in person attendance, and a vote was not taken. (Kovacs Dep. at 44-45, 68; ECF No. 48-2 at App. E00022-00023, E00038).

[19] This statement was made by Dr. Wood, not Professor Turchek. (See ECF No. 48-2 at App. C00051; 48-4 at App. K00004-00005, ¶ 21).

Dr. Wood (via his "waging a personal attack" accusation to Dr. Baugh). (Id. at App.C00057; 48-4 at App. K00004-00005, ¶ 27). Male members of the CIS Department, including Dr. Wood and Dr. Skovira, would end conversations when Dr. Baugh walked into the room. (Id. at App. C00070). During the grievance process with respect to her first grievance in September 2013, Dr. Wood told Dr. Baugh "her gender discrimination claim was 'laughable,' he was 'insulted by this,' and Baugh was a liar" (ECF No. 59 at 39-40, Baugh's SOF 139, RMU's Response to Baugh's SOF 139).

In reply, RMU argues that Dr. Baugh's allegations that: (1) "colleagues would end conversations when [she] entered a room;" (2) she avoids passing Professor Turchek's office as much as possible; and (3) Dr. Wood found her allegation of sex discrimination in her Fall 2013 JAVA course grievance "laughable," are no more than snubbing by supervisors and co-workers and a lack of civility, none of which is not actionable.

Viewing the facts of record in a light most favorable to Dr. Baugh as the nonmoving party, the court concludes, upon considering "the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance'," that while an unprofessional environment existed within RMU's CIS Department, Dr. Baugh did not adduce sufficient evidence from which a reasonable jury could conclude that any intentional discrimination which Dr. Baugh suffered as a result of her sex was either severe or pervasive. Faragher, 524 U.S. at 788. With respect to Dr. Wood's "perfect storm" comment, while a sex-based comment, "[c]onversations in which a prohibited class status is discussed, though offensive are insufficient." Williams v. Pennsylvania Human Relations Comm'n, Civ. No. 14-1290, 2016 WL 6834612, at *22 (W.D. Pa. Nov. 21, 2016); see

McClendon v. Dougherty, 2011 WL 677481, at *9-10 (W.D. Pa. Feb. 15, 2011) (finding no hostile work environment where, *inter alia*, the minority plaintiff has been referred to as a "token"); Jordan v. Mel Blount Youth Home, 2008 WL 2446334, at *5 (W.D. Pa. June 16, 2008) (summary judgment granted because statements that women were emotional/weak, defendant should have hired all men, and questioning plaintiff's entitlement to $20 an hour were insufficient to state claim for hostile work environment).

Professor Turchek telling Dr. Baugh that she was "beating a dead horse," and Dr. Wood's statements to Dr. Baugh that she was "waging a personal attack" against Professor Turchek," her first grievance was "laughable," he "was insult[ed] by this" and Dr. Baugh was a liar, are offensive utterances, but are not severe enough to alter the terms and conditions of her employment. See Palmer v. Fed. Express Corp., 235 F. Supp.3d 702, 719-720 (W.D. Pa. 2016) (where the plaintiff claimed that she felt "harassed," that her dispatcher was rude to her, that her complaints were treated dismissively and that she was told at one point to "go away" from behind closed doors, court concluded that the plaintiff's evidence was woefully inadequate for a reasonable jury to find a hostile work environment based on sex considering the totality of the circumstances; at most, the plaintiff was able to show that certain employees were rude and perhaps dismissive regarding her concerns, but that is insufficient to constitute a hostile work environment based on conduct that is severe and pervasive, much less based on sex); Kegerise v. Susquehanna Twp. School District, Civ. No. 14-0747, 2015 WL 106528, at *10 (M.D. Pa. Jan. 7, 2015) ("The three-white-b*****s comments, profane references and yelling were at most offensive utterances that are not severe . . . enough."); Funayama v. Nichia Am. Corp., Civ. No. 08-5599, 2011 WL 1399844, at *13 (E.D. Pa. Apr. 12, 2011) (concluding that company president groping plaintiff "on the sides of her breasts under her armpits," kissing her, asking her

45

on dates, and making sexual advances did not rise to the level of severe harassment);

McClendon, 2011 WL 677481, at *8-10 (concluding that allegations of racial harassment were

insufficient for hostile work environment claim where plaintiff alleged his application for dean

had not been advanced, plaintiff had been referred to as "a token," plaintiff was accused of

making a baseless claim of racism, defendant would not consider or install a minority female as

interim dean, defendant appointed individual referencing "a token" to decanal search committee,

defendant appointed white dean without interviewing any minority candidate, and once plaintiff

filed charge of discrimination, internal investigation ceased).

While Dr. Wood and Professor Turchek's treatment of Dr. Baugh was at times

humiliating to Dr. Baugh, their conduct was never physical and affected Dr. Baugh's work

performance only to the extent that she decided to participate in the monthly department

meetings by phone.[20] See Rosati v. Colello, 94 F. Supp.2d 704, 716 (E.D. Pa. 2015) (court

found that plaintiff failed to make a *prima facie* showing of a hostile work environment where

supervisor's comments were offensive but isolated, there were no allegations that the conduct

was physically threatening, humiliating or unreasonably interfered with the plaintiff's work

performance and the three incidents occurred over a four-month period). *Cf.* Jensen v. Potter, 435

F.3d 444, 449 (3d Cir. 2006), overruled in part on other grounds by Burlington N. & Santa Fe

Ry. Co. v. White, 548 U.S. 53 (2006) (appellate court concluded a jury could find severe

retaliatory harassment where there were retaliatory insults, physical threats, and at least four

instances of property damage to the employee's vehicle); Vandegrift v. City of Phila., 228 F.

Supp.3d 464, 487 (E.D. Pa. 2017) (where plaintiff experienced sex-based comments and

---

[20] Dr. Kovacs explained that under the CBA, professors were not required to participate at department meeting in person. (See ECF 38-9 at 9). Dr. Paullet also participated in the CIS Department meetings by telephone. (See ECF No. 48-4 at App. I00018).

conduct, was sexually assaulted by a supervisor and a coworker exposed himself to her while they were in a patrol car, court concluded that considering the totality of the circumstances, a reasonable jury could conclude the plaintiff personally endured severe harassment).

The remaining conduct about which Dr. Baugh complains, that of male colleagues, including Dr. Wood and Dr. Skovira, stopping their conversations when Dr. Baugh walked into a room, may be hurtful to Dr. Baugh, but it does not constitute harassment. Jensen, 435 F.3d at 452 (where coworkers subjected the plaintiff to the silent treatment, appellate court held, "[a] cold shoulder can be hurtful, but it is not harassment.) (citation omitted); Williams, 2016 WL 6834612, at *20 (explaining that rudeness or perceived rudeness by one's superiors is insufficient to establish a hostile work environment claim).

The evidence of record also does not support that the harassing conduct about which Dr. Baugh complains took place "either in concert or with regularity." Andrews, 895 F.2d at 1484 (citation omitted); see Williams, 2016 WL 6834612, at *21 ("Harassment can be said to be pervasive when 'incidents of harassment occur either in concert or with regularity'") (quoting Andrews, supra.); Obergantschnig v. Saw Creek Estates Community Ass'n, Inc., Civ. No. 12-5911, 2013 WL 5676328, at *6-7 (E.D. Pa. Oct. 18, 2013) (court explained, "Third Circuit courts have found sexual, derogatory, or insulting statements to be actionable when they are made on a very frequent and continuous, for example weekly, basis" and "[i]n contrast, Third Circuit courts have held that statements or rumors made in isolated incidents over a period of time are not actionable). Dr. Baugh does not provide even a general time period for much of the conduct about which she complains. Of the conduct about which she provided at least a general time frame, the incidents took place episodically over an approximately sixteen-month time period. The first instance was in September 2013, when Dr. Wood critiqued Dr. Baugh at a meeting

concerning her first grievance.[21] The conduct then commenced again in the fall of 2014 and

continued to at least January 2015,[22] at many but not all of the monthly CIS Department

meetings, where Professor Turchek would yell at Dr. Baugh in response to her asking questions

about the Enterprise Certificate Program. See Rosati, 94 F. Supp.2d at 716 (court concluded that

three incidents within a four-month period was not a continuous period of harassment);

Tourtellotte v. Eli Lilly and Co., Civ. No. 09-0774, 2013 WL 1628606, at *6 (E.D. Pa. Apr. 16,

2013) (concluding that fewer than a dozen interactions over the course of eighteen months were

sporadic, isolated events); Gharzouzi v. Northwest Human Services of Penn., 225 F.Supp.2d

514, 536 (E.D. Pa. 2002) (where comments were relatively benign, court held that six incidents

over a four-month time period (three incidents in one month and one incident in the other three

months) did not state a hostile work environment claim); Guy v. Day Products, Inc., Civ. No. 94-

1699, 1995 WL 701569, at *3 (E.D. Pa. Nov. 29, 1991) (concluding that negative, sexist, or

derogatory gender related remarks made at least once or twice a week over a ten-month period

was pervasive). Cf. Jensen, 435 F.3d at 449 (appellate court concluded a jury could find

pervasive retaliatory harassment where there were retaliatory insults two to three times per week

for nineteen months, physical threats, and at least four instances of property damage to the

employee's vehicle); Vandegrift, 228 F. Supp.3d at 487 (court concluded, based upon plaintiff

testifying that she experienced sex-based comments or conduct at least weekly throughout her

employment, was sexually assaulted by a supervisor and a coworker exposed himself to her

---

[21] RMU admitted that Dr. Wood "stated that he found Baugh's allegations of gender discrimination in her Fall 2013 JAVA course assignment grievance to be 'laughable,' and that he was 'insulted' by the grievance and believed that [Dr. Baugh] was a liar." (ECF No. 59 at 40, RMU's Response to Baugh's SOF 139).
[22] It was at the January 2015 Department meeting that Professor Turchek told Dr. Baugh she was "beating a dead horse" and Dr. Wood accused Dr. Baugh of "waging a personal attack" against Professor Turchek.

while they were in a patrol car, that considering the totality of the circumstances, a reasonable jury could conclude the plaintiff personally endured pervasive harassment).

RMU also argues that Dr. Baugh failed to adduce sufficient evidence for a reasonable jury to find that Dr. Baugh suffered intentional discrimination because of her gender or that the alleged harassment would detrimentally affect a reasonable person in like circumstances. If a plaintiff does not adduce sufficient evidence for a reasonable jury to find in her favor on any one element of her *prima facie* hostile work environment claim, then summary judgment must be granted in favor of the defendant employer. See, *e.g.*, Gilson v. Penn. State Police, 676 F. App'x 130, 138 (3d Cir. 2017) (appellate court concluded that "even if [plaintiff] could show that he suffered intentional discrimination because of his sex, his hostile work environment claim fails because, as the District Court recognized, he failed to present sufficient evidence from which a factfinder could conclude that he suffered from discrimination that was 'severe or pervasive'"); Phillips v. SEPTA, Civ. No. 16-0986, 2018 WL 827440, at *6 (E.D. Pa. Feb. 2, 2018) (district court concluded that where the plaintiff's evidence failed "to establish the second prong of a hostile work environment claim, namely the requirement that the alleged harassment be severe or pervasive," the plaintiff had failed to state a *prima facie* hostile work environment claims and the defendant's motion for summary judgment was granted). Because Dr. Baugh failed to adduce sufficient evidence in support of the second element of her hostile work environment claim, that the conduct was severe or pervasive, the court need not address the other arguments raised by RMU in support of its motion for summary judgment on Dr. Baugh's hostile work environment claims.

For the reasons set forth, RMU's motion for summary judgment on Dr. Baugh's Title VII, Title IX, and PHRA hostile work environment claims shall be granted.

**IV. Conclusion.**

      For the reasons discussed above, RMU's motion for summary judgment (ECF No. 35)

will be granted in part and denied in part.

      An appropriate order follows.


March 20, 2018                           By the court:

                                               s/Joy Flowers Conti
                                               Joy Flowers Conti
                                               Chief United States District Judge